Johnnie L. FRANCIS, Robert L. Martin, John L. Hughley, Cornell L. Conroy, and the National College of Business

v.

Max CLELAND, Administrator, Veterans Administration, A. H. Thornton, Director, Veterans Administration Center.

No. Civ 76–5085.

United States District Court, D. South Dakota.

June 25, 1977.

James P. Hurley, Rapid City, S. D., for plaintiffs.

David V. Vrooman, U. S. Atty., Sioux Falls, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

### I.

This action was commenced by four armed forces veterans and an educational institution which enrolls veterans. Plaintiffs' theory is simply that the challenged sections of the Veterans' Education and Employment Act of 1976 conflict with the federal Constitution; hence, they ought be declared null and void and defendants ought be enjoined from enforcing them.

### II.

Plaintiffs filed their complaint asking for injunctive relief on December 31, 1976. On December 31, 1976, this Court entered a temporary restraining order enjoining defendants from enforcing the challenged sections as they applied to these plaintiffs. A hearing on the application for a preliminary injunction was set for January 17, 1977. At said hearing plaintiffs came forward with evidentiary matter (some witnesses and many exhibits) by which they tried to establish the prerequisites for continuing injunctive relief. Plaintiffs at that hearing asked for additional time to present evidence. Defendants argued vigorously that the taking of any evidence was of no possible benefit as the only thing then before the Court was a legal question; namely, whether or not the challenged pieces of legislation were rationally related to some legitimate governmental objective. Their point was well taken insofar as their motion to dismiss raised a purely legal question. However, as to whether or not continued injunctive relief was proper, this Court determined that it would be most fair to everyone to continue the hearing until the earliest convenient moment at which time each party would have opportunity to put in whatever evidence seemed material and relevant. The restraining order was left in effect pending further order of the Court and February 7, 1977, was set for the next hearing date.

On February 7, 1977, plaintiffs put in some evidence and defendants put on one witness. This Court then denied defendants' motion to dismiss. Defendants had moved earlier to consolidate the hearing on the application for preliminary injunctive relief with the hearing on the merits; and there being no opposition to such consolidation motion, defendants' motion was granted.

Subsequently, plaintiffs moved for leave to file an amended complaint stating that they wanted to amend to conform to the evidence submitted. Leave was granted. An amended complaint was thereupon filed. Plaintiffs also filed a motion to reopen which this Court denied. Defendants moved to dismiss the amended complaint and also moved in the alternative for summary judgment. Briefs are all in, and the case is in a posture for final disposition on the merits.

### III.

■ Plaintiffs allege that jurisdiction exists under 28 U.S.C. § 1331 and under 28 U.S.C. § 1361. It appears from the briefs that defendants are not making an issue of jurisdiction. We think plaintiffs' reliance upon 28 U.S.C. § 1331 is well-placed, and proceed on the theory that a federal question has been presented.

Although plaintiffs allege damages in excess of $10,000.00, we make no finding as to the monetary amount in dispute. We deem it sufficient to note that 28 U.S.C. § 1331(a) as amended by Public Law 94–574, section 2, provides that no jurisdictional amount is necessary in any action predicated on § 1331 and brought "against the United States, any agency thereof, or any officer or employee thereof in his official capacity."

### IV.

This lawsuit presents a challenge to three specific provisions of the Veterans Education and Employment Act of 1976. These are:

(A) Section 205(d) of Public Law 94–502 which amends 38 U.S.C. § 1673(d);

(B) Section 509(b) of Public Law 94–502 which amends 38 U.S.C. § 1789; and

(C) Section 307 of Public Law 94–502 as it amends 38 U.S.C. § 1724.

The changes made by each of these amendments will be outlined separately.

A. Title 38 U.S.C. § 1673(d) embodies what is commonly known as the 85–15 rule. The Administrator is directed to disapprove a veteran's enrollment in any course for which he is not already enrolled if more than 85 percent of the students enrolled in that course are subsidized in whole or in part by the federal government or the educational institution itself. Disapproval would mean, of course, that G.I. Educational Benefits would not be paid unless the veteran found some approved courses. Thus the 85–15 rule is an attempt to force upon courses a market test; i. e. the theory behind the legislation is that if a course can attract a certain percent of paying students, then it is probably less likely to be a gimmick to attract veterans' dollars and more likely to be a quality course.

Prior to the amendment of 1976, 38 U.S.C. § 1673(d) read in relevant part as follows:

(d) The Administrator shall not approve the enrollment of any eligible veteran, not already enrolled, in any course which does not lead to a standard college degree and which is offered by a proprietary profit or proprietary nonprofit educational institution for any period during which the Administrator finds that more than 85 per centum of the students enrolled in the course are having all or part of their tuition, fees, or other charges paid to or for them by the educational institution or the Veterans' Administration under this title.

Subsequent to the amendment of 1976, § 1673(d) reads in relevant part:

The Administrator shall not approve the enrollment of any eligible veteran, not already enrolled, in any course . . . for any period during which the Administrator finds that more than 85 per centum of the students enrolled in the course are having all or part of their tuition, fees, or other charges paid to or for them by the educational institution, by the Veterans' Administration under this title and/or by grants from any Federal agency.

The significance of this 1976 amendment to § 1673 is twofold:

(1) the section is extended to cover courses not previously covered, and

(2) the allowable composition of the 85 percent group (which may be subsidized in one form or another) is altered.

Prior to the 1976 amendment the 85–15 rule pertained to courses offered by proprietary profit and proprietary nonprofit educational institutions if the courses led to something less than a standard college degree. The latest amendment extends the 85–15 rule to courses offered by public, tax-supported schools as well as to courses of other institutions not supported by taxes even if the courses, at either type of school, lead to a standard college degree. In effect, § 205(d) of P.L. 94–502 extends the 85–15 rule to courses offered by all institutions of higher learning, the rest of the "educational universe." (Wolowitz, T273)

The second change in § 1673 is more significant for the present lawsuit. Under the law before the 1976 amendment the computation of 85 percent of the students, which could permissibly be subsidized in any course, was done without reference to students receiving federal grants other than veterans' benefits. As of December 1, 1976, the 85 percent must be computed differently. Students receiving aid from any federal agency or from the school itself are all thrown over into the potential 85 percent category; hence, at least 15 percent of the students enrolled in a course must be financed by their own resources, parents or some source other than the educational institution or the federal government.

B. Title 38 U.S.C. § 1789 embodies what is commonly referred to as the two-year rule. The two-year rule means basically that the Administrator is required to disapprove a veteran's enrollment in courses

(hence his benefits) if the course has not yet been offered for two years. Some exceptions are allowed. The theory is the same as that underlying the 85–15 rule; namely, to force a course to survive a market test before G.I. Bill dollars start supporting it.

Prior to the amendment of 1976, 38 U.S.C. § 1789 stated as follows:

§ 1789. Period of Operation for approval. (a) The Administrator shall not approve the enrollment of an eligible veteran or eligible person in any course offered by an educational institution when such course has been in operation for less than two years.

(b) Subsection (a) shall not apply to—(1) any course to be pursued in a public or other tax-supported educational institution;

(2) any course which is offered by an educational institution which has been in operation for more than two years, if such course is similar in character to the instruction previously given by such institution;

(3) any course which has been offered by an institution for a period of more than two years, notwithstanding the institution has moved to another location within the same general locality, or has made a complete move with substantially the same faculty, curricula, and students, without change in ownership;

(4) any course which is offered by a nonprofit educational institution of college level and which is recognized for credit toward a standard college degree; or

(5) any course offered by a proprietary nonprofit educational institution which qualifies to carry out an approved program of education under the provisions of subchapter V or VI of chapter 34 of this title (including those courses offered at other than the institution's principal location) [38 USCS §§ 1690–1693 or 1695–1697A] if the institution offering such course has been in operation for more than two years. (Oct. 24, 1972, P.L. 92–540, Title III § 316(2), 86 Stat. 1087.)

Subsection (a) set out a general rule, and subsection (b) provided several exceptions to the rule.

The new law cuts back on exceptions by qualifying subsection (b). Subsection (b) is qualified by a new subsection (subsection (c)) which states:

Notwithstanding the provisions of subsection (b)(1), (2), (3), or (4) of this section, the provisions of subsection (a) shall apply to any course offered by a branch or extension of—

(1) a public or other tax-supported institution where the branch or extension is located outside of the area of the taxing jurisdiction providing support to such institution; or

(2) a proprietary profit or proprietary nonprofit educational institution where the branch or extension is located beyond the normal commuting distance of such institution.

This legislation extends the two-year rule to courses not heretofore covered, i. e. certain courses offered by public tax-supported institutions and certain courses offered by private schools even though the courses are recognized for credit toward a standard college degree. Public schools may offer courses in branches or extensions anywhere within their taxing jurisdiction without having veterans who enroll in them be subject to the two-year rule. Other schools can branch out within commuting distance (25 or 30 miles according to testimony) without triggering the two-year rule for veterans who enroll in courses offered at such a branch or extension.

C. Title 38 U.S.C. § 1724 is aimed at an objective different from that underlying the 85–15 and two-year rules. While the latter two rules attempt to insure quality courses, § 1724 attempts to insure that the enrolled veteran actually does something constructive while he is in school. Section 1724 attempts to insure that each veteran, instead of merely enjoying the academic environment, makes definite progress toward an educational goal.

Prior to the 1976 amendment, 38 U.S.C. § 1724 read as follows:

The Administrator shall discontinue the educational assistance allowance on behalf of an eligible person if, at any time, the Administrator finds that according to the regularly prescribed standards and practices of the educational institution he is attending, his conduct or progress is unsatisfactory.

The Administrator may renew the payment of the educational assistance allowance only if the Administrator finds that—

(1) the cause of the unsatisfactory conduct or progress of the eligible person has been removed; and

(2) the program which the eligible person now proposes to pursue (whether the same or revised) is suitable to the person's aptitudes, interests, and abilities.

One qualifying sentence has now been added and it states:

Unless the administrator finds there are mitigating circumstances, progress will be considered unsatisfactory at any time an eligible person is not progressing at a rate that will permit such person to graduate within the approved length of the course based on the training time as certified to the Veterans' Administration.

In essence, the Congress set out to define "unsatisfactory progress." In doing so, time limits will be set insofar as a course of study will have an approved length; deviation will be regarded as dereliction and benefits will be withdrawn.

### V.

As stated earlier, each of the three enumerated sections of the Veterans' Education and Employment Act of 1976 is challenged on the theory that each conflicts with one or more of the amendments to the United States Constitution. Preliminary to an in-depth analysis of such claim, it is essential to resolve the issue of which of these plaintiffs, if any, has brought a concrete case or controversy rather than an abstract question of law to this Court, i. e. who, if anyone, is so situated that he has standing to make these challenges.

### VI.

The standing issue necessitates two separate levels of inquiry; indeed, as the United States Supreme Court has recently observed when a standing issue was raised:

[T]wo distinct standing questions are presented. . . . and they are these: *first,* whether the plaintiff-appellees allege "injury in fact," that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction, and *second,* whether as a prudential matter, the plaintiff-appellees are proper proponents of the particular legal rights on which they base their suit. (Emphasis added.) *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976) *citing Data Processing Service v. Camp,* 397 U.S. 150, at 152–153, 90 S.Ct. 827, at 829, 25 L.Ed.2d 184 (1979); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); and *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953) wherein the two separate criteria for standing are distinguished.

The issue of standing having been contested by defendants, we deem it proper at this point not only to examine plaintiffs' allegations, but also to determine as matters of fact whether plaintiffs meet the standing requirements set out in *Singleton v. Wulff.*

A. The requirement of injury in fact is based on the Art. III requirement of a case or controversy; *Data Service Processing v. Camp, supra.* Without injury in fact there can be no case or controversy in the constitutional sense. The injury need not necessarily be economic. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (hereinafter SCRAP). Neither the degree of harm nor the significance of the grievance are required to be quantitatively measured when a court examines the first element of the standing test. *SCRAP,* 93 S.Ct. at 2417, n.14.

Nevertheless, a plaintiff must allege and, if the point is controverted, must prove that some concrete injury has either been inflicted upon him or will immediately be inflicted upon him if the Court does not protect him.

■ 1. Plaintiff Johnnie Francis, after his discharge from the United States army, tried several business ventures which failed. Mr. Francis was advised that his business prospects would be improved if he obtained some business training, so with that purpose in mind he enrolled at the National College of Business (hereinafter N.C.B.). He studied for six quarters and drew G.I. educational benefits during that time.

At the time of Mr. Francis' testimony in court, he was not enrolled, but had reapplied. He had no idea whether he had been accepted or not, but was definitely operating on the assumption that the 85–15 rule was somehow a barrier to the continuation of his business education. Plaintiffs produced no evidence, however, to show that Johnnie Francis' enrollment in any particular course would be disapproved by the Administrator on the basis of the 85–15 rule or the two-year rule.

The effect of the new law has not been linked to the situation of Johnnie Francis. He has some vague apprehensions, but no injury in fact. To assert that injury to him would likely occur would be, on this record, pure conjecture. We must conclude, therefore, that Johnnie Francis has not presented a concrete case or controversy and has no standing to challenge 85–15 or the two-year rule. Not being enrolled, he is assuredly in no position to challenge 38 U.S.C. § 1724, the progress requirement.

■ 2. Plaintiff Cornell L. Conroy is presently enrolled at N.C.B. and is drawing G.I. educational benefits. The modified 85–15 rule and the modified two-year rule do not apply to a course in which a veteran is already enrolled. At present Mr. Conroy is even more removed from injury in fact traceable to these rules than is Johnnie Francis. We must hold therefore that Cornell Conroy has no standing to challenge either 85–15 or the two-year rule.

With respect to 38 U.S.C. § 1724, however, his position must be viewed differently. That section could rightfully be challenged, not by someone hoping to enter a course of study, but rather by someone hoping to remain in a course of study when his progress was judged unsatisfactory. If there were evidence tending to show that Mr. Conroy was not progressing toward his goal within the time limits approved by the Administrator, then he would be an ideal plaintiff to challenge 38 U.S.C. § 1724.

As the record stands now, we have no evidence that Mr. Conroy is progressing less rapidly than N.C.B. or the Veterans Administration thinks he ought. We have no evidence whatever that his benefits might be terminated for failure to progress rapidly enough; hence, as to 38 U.S.C. § 1724 we must also conclude that Mr. Conroy has no standing to sue because he has neither alleged nor proved injury in fact.

■ 3. Plaintiff Robert L. Martin is on active duty in the United States Air Force. He was enrolled part-time at N.C.B. in 1976; he dropped out sometime in September and has not applied for re-enrollment at any N.C.B. branch.

Presently, this plaintiff is seeking an early separation (he still has approximately twenty-two months active duty) and hopes to return to his home in Baldwin City, Kansas, where he would be able to attend the Shawnee Mission branch of N.C.B. Because the Shawnee Mission extension, at the time of the hearing, had not yet been in operation for two years, the contemplated move could put Mr. Martin into a position in which he would be out of the Air Force but would not be able to get G.I. educational benefits for attendance at Shawnee. We have no evidence that the early separation will occur, however, and Mr. Martin has not even made inquiries as to whether he could be admitted to the Shawnee Mission branch of N.C.B.

A concrete case or controversy concerning 85–15 and the two-year rule is lacking and standing to challenge those sections

must be denied. For the reasons discussed in Mr. Francis' case, this plaintiff has no standing to challenge 38 U.S.C. § 1724.

4. Plaintiff John L. Hughley did not testify at the hearing; accordingly, his position must be sketched from the uncontroverted assertions of his affidavit. He enrolled at N.C.B. in 1975, it is implied in the affidavit that he is still enrolled there, and he expresses grave concern about his future if his educational benefits are cut off.

As with Cornell Conroy, some change in his situation would have to occur before the 85–15 rule or the two-year rule would pose any threat to his benefits. Having no evidence that such a change is imminent, we can only conclude that plaintiff Hughley has alleged no injury in fact and consequently has no standing to challenge the 85–15 rule or the two-year rule. For the reasons stated in our discussion of Mr. Conroy's situation, we likewise conclude at this point that John L. Hughley has no standing to challenge 38 U.S.C. § 1724.

5. N.C.B. is a nonprofit South Dakota corporation engaged in the business of higher education. John W. Hauer, president of N.C.B., testified at length about the programs offered by N.C.B., the investments made for the education of veterans and the immediate injury that would occur if the temporary restraining order were lifted. According to his testimony, investments in programs designed for the education of veterans is substantial; at least $680,000 has been invested in programs specifically designed to meet the needs of veterans. Veterans' responses have been good; consequently, the night school program in Rapid City and the courses at most of the branches are filled mostly by veterans.

Mr. Hauer testified that the situation of N.C.B. was such that application of the 85–15 rule would immediately put in jeopardy each and every program run by the school with two possible exceptions: the day school program in Rapid City and the program offered at a branch in Phoenix, Arizona.

His testimony relating to the effect of the two-year rule was similar to his testimony about the 85–15 rule. Because seven of N.C.B.'s thirteen extensions were, at the time of the hearing, less than two years old, it is plain that courses offered at these branches could not be approved for veterans. It was admitted, of course, that the extensions are all beyond commuting distance from the main campus in Rapid City.

From the record this Court finds with reference to N.C.B.: this educational institution has a great financial investment in the education of the veterans and, if 85–15 and the two-year rule, or either, is applied to N.C.B., direct and immediate economic injury will occur. We conclude on the basis of these findings that the first half of the standing test has been passed by N.C.B. Insofar as N.C.B. seeks to challenge 85–15 and the two-year rule.

N.C.B. has, however, produced on the record no evidence of any injury caused by or likely to be caused by the application of 38 U.S.C. § 1724. In regard to that section, the first requirement for standing is missing and standing to press that claim will, accordingly, be denied.

B. Having found injury in fact in regard to N.C.B., a more difficult issue must be confronted; namely, whether N.C.B. is the proper proponent of the particular legal rights upon which the suit is based. The lawsuit is based upon several legal rights among which are: (1) the right to due process of law, (2) the right to equal protection of the law,[1] (3) the freedom (right) of association, (4) the right to travel, and (5) the right of privacy. Plaintiff N.C.B. also claims that the challenged legislation is: (6) an unlawful delegation of power, and (7) that it allows unlawful federal control of a private educational institution.

1. Plaintiffs' eighth claim for relief in their Amended Complaint appears to rest on the same legal theory as their second claim for relief, that is, the theory that equal protection principles are violated.

With the possible exception of the last claim, *supra,* these asserted rights are not asserted to be rights of N.C.B. which are being violated by the new veterans' bill. In the well-pleaded amended complaint, plaintiffs plainly assert that the rights being violated are veterans' rights, not the rights of the institutional plaintiff. We are faced then with a peculiar dilemma: the rights asserted are those of veterans, but the only imminent injury we have found at this point is the threat of financial ruin for N.C.B. The question, therefore, is whether or not N.C.B., as an institution which provides services to veterans, can couple its potential injury with the veterans' constitutional rights and thereby become a proper proponent of the legal rights upon which the lawsuit is based. This Court has concluded that N.C.B. can properly link its injury with the students' rights and thereby gain standing in federal court.

■ The key is the *jus tertii* concept which has recently been applied in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) and was explained in greater detail in *Singleton v. Wulff, supra.* It is a general rule that federal courts will not resolve controversies on the basis of the rights of third persons not parties to the lawsuit. *Barrows v. Jackson,* 346 U.S. at 259, 73 S.Ct. at 1036 (1953). The rule, however, has an exception.

■ A litigant will be allowed to invoke the *jus tertii* doctrine, allowing him standing on the basis of the third person's rights, when two specific factual determinations are made. First, it must be determined that the litigant's activity is so bound up with the right of the third person that the litigant will be directly affected by the outcome of the suit, and is so situated as to become fully, or nearly, as effective an advocate as the person whose rights are asserted. Thus the nature of the relationship is crucial. *Singleton v. Wulff, supra.* Second, there must exist a genuine obstacle that prevents the third party from being the most effective proponent of his own rights. In this situation that party in court becomes, as by default, the best advocate. *Singleton v. Wulff, supra.*

The case before the Court presents a situation to which the *jus tertii* concept is applicable. The relationship between N.C.B. and veterans is definitely such that the litigants' activities (education) are inextricably bound up with the veterans' rights. N.C.B. is in a position to be a very effective advocate for veterans' rights. Moreover, there is definitely an obstacle that prevents veterans from effectively asserting their rights. In *Singleton v. Wulff* the Supreme Court recognized "imminent mootness" as an obstacle. In this suit, there is the obstacle posed by the converse of the mootness doctrine, *i. e.* ripeness. A student would not have a ripe controversy unless a course were disapproved. If he commenced a lawsuit at that point, the educational opportunity would no doubt be gone by the time a final decision was made. Thus, as a practical matter, a veteran who actually needs the V. A. funds for school at a special point in time has little chance of challenging any legislation.

This Court concludes, therefore, that N.C.B. has standing to sue and advocate the rights of veterans on the basis of the *jus tertii* doctrine. Though not always labeled as applications of the *jus tertii* doctrine, the principle itself has a long history. In 1927 in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, the Supreme Court recognized the standing of two private schools to assert the constitutional rights of their students and the students' parents when such rights were being deprived by a state statute requiring universal attendance at public schools. The schools combined their economic injury and the students' constitutional rights to get standing in federal court. *See also Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586, wherein Supreme Court recognized the standing of an owner of real property subject to a restrictive covenant to sue on the basis of the constitutional rights of a third party purchaser; *Akron Board of Education v. State Board of Education of Ohio,* 490 F.2d 1285 (1974) *cert. denied* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236,

wherein the Sixth Circuit recognized that a municipal school board and its superintendent had standing to assert the constitutional rights of the district's children; and *Singleton v. Wulff, supra*, wherein physicians challenging a state law prohibiting Medicaid payments for non-therapeutic abortions gained standing because the doctors showed that their economic injury and their patients' constitutional rights were inextricably intertwined.

Most recently in *Craig v. Boren, supra*, the Oklahoma beer vendor was allowed standing by coupling the constitutional rights of Oklahoma males between the ages of 18 and 21 with the constriction of the plaintiff's market caused by the challenged statute that prohibited sale of 3.2 beer to males of that age bracket. Again, the litigants' economic injury coupled with the third party's constitutional rights in a particular relationship was sufficient to provide standing to sue in federal court.

### VII.

Several theories have been advanced by plaintiffs to support the contention that 85–15 and the two-year rule are unconstitutional. Plaintiffs have urged with particular vigor that 85–15 and the two-year rule violate their right to equal protection of the laws; and as this Court perceives the issues, plaintiffs' most meritorious arguments have been those based upon an equal protection theory. Therefore, this Court elects to first examine the claims urged in light of the equal protection doctrine insofar as it is incorporated into the due process clause of the fifth amendment.

██ We begin with the assumption that the due process clause of the fifth amendment incorporates the general principle of equal protection; namely, that persons similarly situated should be treated similarly. *See e. g. Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *U. S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 2825 n. 5, 37 L.Ed.2d 782 (1973). The standards to be used for testing the constitutionality of federal classifications under the fifth amendment are virtually identical to the standards to be used in determining whether or not a state classification violates the equal protection clause of the fourteenth amendment. *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Our primary task is to ascertain what standards ought to be applied to test the classifications made by the challenged legislation.

The law of equal protection has changed greatly over the past century, and in recent years this particular branch of the law has evolved very rapidly to cover dimensions of our social, political and economic life which were heretofore beyond the ambit of equal protection. There does not at present appear to be unanimous agreement among the members of the Supreme Court as to the state of the law of equal protection. *See e. g. Craig v. Boren, supra*, where Justices Stewart, Blackmun, Powell and Stevens each wrote separate, concurring opinions and the Chief Justice and Justice Rehnquist wrote separate, dissenting opinions. This Court is obliged to search the case law and reason by analogy to reach a just result here. We readily admit that we are plowing new ground in an era when some of the old reference points are tending to fade away.

### VIII.

The traditional approach to equal protection questions was to apply the standard set out in *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The essence of that test is that legislation must be reasonable, not arbitrary or capricious, in making classifications among persons. Under the *Lindsley* approach, a challenged classification will be sustained if any state of facts can reasonably be conceived in support of it. One challenging a classification bears the burden of showing that it is arbitrary.

The prevailing and continuing concept of the traditional approach has been that of "rational relationship" or "substantial and fair relationship" between a legitimate, governmental objective (easy to postulate)

and a specific piece of legislation. The very nature of the concept allows for flexibility and adaptability; it also allows for easy judicial abdication. Thus, almost anything can pass the most minimal level of scrutiny which is allowable within the concept of rational relationship.

To apply this minimal level of review to the present lawsuit, the reasoning process must be as follows: (1) establish the purpose of the legislation; (2) examine the nature of the class created; and then (3) make inquiry to determine how, if at all, the two are linked together by reason.

The purpose of the legislation (both 85–15 and the two-year rule) is plain to this Court. As stated earlier in this opinion, both laws are an attempt to insure that veterans enroll in quality courses if federal dollars are going to help support those courses. Conversely, it can be said that the purpose of these laws is to prevent charlatans from grabbing the veteran's education money. These are the immediate, remedial goals of the legislation. As remedial measures they are intended to advance the ultimate goal of the legislation giving veterans educational benefits, the goal of helping veterans individually to improve themselves and their lot in society.

During the hearings some effort was directed toward demonstrating that there was no rational relationship between the problem of recouping overpayments to veterans and the 85–15 and two-year rules. That is certainly true, but as the government pointed out, 85–15 and the two-year rule are aimed at another problem entirely; specifically, the problem of insuring quality education. For our purposes, overpayments are irrelevant. We must consider the link, if any, between the classifications made by the laws and the remedial purposes of those laws.

The classification complained of in this lawsuit is the classification of veterans receiving educational benefits apart from all other persons receiving federal funds to subsidize their educations. The 85–15 rule and two-year rule will under no circumstances operate to the detriment of individuals going to school on federal funds other than V. A. benefits. In short, there is a different treatment of persons based upon the type of federal subsidy for education which they receive.

The crux of the problem is in determining whether or not veterans and non-veterans getting federal money for education under different programs are really similarly situated. We conclude that they are. All are beneficiaries of one and the same thing: social legislation that is aimed at raising the educational level and hence the opportunities and capacities of a certain segment of the populace. In either case we are dealing with governmental largess. cf. C. A. Reich, "The New Property," 73 Yale Law Journal (1964). V. A. benefits have been called gratuities. *Milliken v. Gleason*, 332 F.2d 122, 123 (1st Cir.1964), *cert. denied* 379 U.S. 1002, 85 S.Ct. 723, 13 L.Ed.2d 703 (1965). Veterans' educational benefits are a statutory entitlement as are benefits created by other social legislation, and we can see no reason in this case to distinguish them from other types of benefits under different names that subsidize higher education. By treating V. A. benefits as governmental largess, however, this Court does not imply that recipients have no protected interest whatever in their continuation.

We have, therefore, a class of persons who are recipients of government largess for the purpose of furthering their education; within that class the recipients of one particular type of largess are singled out for special treatment. Congress has made a special class out of veterans receiving government funds for higher education in an effort to shield and protect every member of that class from abuses perpetrated upon them by unscrupulous recruiters who would otherwise entice them to enroll in substandard courses.

Under the minimum requirements of the rational relationship test discussed, *supra,* can this classification pass muster? We must ask whether any state of facts reasonably may be conceived to justify the discrimination. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

Using that formulation of the applicable law, the answer to the question posed is necessarily affirmative.

All that is required are two assumed facts. First, one must assume that the market test really does work in education in the manner in which Congress apparently believes it does; in other words, courses at least two years old will be safer (of higher quality) than new courses, and courses where friends, relatives or students pay the total cost for at least 15 per cent of enrollees will be of higher quality than courses supported almost exclusively by veterans. Second, one must assume that veterans will be more gullible or more prone to abuse their benefits than other beneficiaries of government largess. On those two assumptions alone, a bridge of reasonable relationship can be built between the classification created by the legislation and the purpose to be achieved by the legislation.

If the minimum level of review available under the rational relationship test is the applicable standard of review in this case, plaintiffs ought to be sent home empty-handed. We have not done so for the reason that we believe something more is required; the standard of review to be applied must be more intense than that heretofore discussed.

### IX.

The traditional test for reviewing equal protection questions has been refined and developed by the United States Supreme Court in two respects: (1) A statutory classification based upon suspect criteria will be in jeopardy unless the state (government) can demonstrate a compelling interest as justification for said classification; (2) A classification affecting fundamental rights will likewise be in serious trouble unless a compelling governmental interest is demonstrated.

It is quite apparent that the classification complained of in this case is by no stretch of the imagination "suspect". Veterans as a class have no history of deprivation of rights by reason of their status as veterans. The consequences of being classified as vet-erans do not approach the consequences of classification by race, which is the only classification which can be termed "suspect" with any certainty. *See Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *cf. Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

The Supreme Court has declined to hold that education is a fundamental right. *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). That being the state of the law, we cannot proceed to assert that monetary benefits for higher education are a fundamental right; hence, the strict scrutiny test is not triggered by an alleged deprivation of education benefits.

It is noted that plaintiffs also contend that the fundamental right of interstate travel is impinged upon. On the basis of *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), they contend that this fundamental right must not be restricted in any manner, and on the basis of the right to travel they would have us invoke the strict scrutiny test. We have considered this idea and find it to be without merit.

No one could seriously argue that the right to interstate travel is less than fundamental. Before making any strict scrutiny of the legislation, however, it is necessary to make a preliminary search to discover whether or not this right is even arguably impinged upon. A cursory inquiry reveals the following: (1) The 85–15 rule has only the most attenuated connection with interstate travel; the most we could say is that a veteran residing in a state where the schools had a relatively low veteran population would be risking possible denial of benefits if he (she) contemplated moving to a state where schools had a relatively high veteran population. (2) The nexus between the two-year rule and interstate travel is a little more obvious; yet, the chain of reasoning between the rule and any possible impingement is again very attenuated. One would have to assume the existence of

veterans in one particular state who seek to move to a second state wherein there existed no (or few) courses two years old or more that would meet the needs of the veterans in question. We have nothing to verify that kind of assumption.

A veteran could certainly protest that he wants to travel to some point in a foreign state and that, in the absence of an acceptable course at that situs, he would be deterred from moving. The right to travel, however, deals only with the right to travel across interstate lines, and does not include any inherent right to equal social and economic advantages at all points within the foreign state into which one hopes to travel.

Plaintiffs have also raised the right to associate freely and the right of privacy as potential fundamental interests that are infringed upon by the challenged legislation. We are unable to find a nexus between these rights in their present dimensions and the challenged rules.

At this juncture, therefore, we must conclude that although many ideas have been put forward, none carries enough weight to create in the mind of this Court the belief that a fundamental interest is at stake. Therefore, we must strike from consideration the strict scrutiny test as a proper standard for judging the classification herein presented to us.

### X.

During the 1970s there has been much discussion among commentators and court watchers on the question of whether or not in equal protection cases a standard of review somewhere between "strict scrutiny" and minimal inquiry in search of a "rational relationship" either has been constructed or is now emerging. One view is that a "middle tier," a medium level of review has come into being. *Reed v. Reed, supra,* and its progeny down to *Craig v. Boren, supra,* are accordingly viewed as examples of a "middle tier" approach. Justice Powell, concurring in *Craig v. Boren,* acknowledged this commonly articulated view of the Court's work and commented upon it as follows:

> As has been true of *Reed* and its progeny, our decision today will be viewed by some as a "middle-tier" approach. While I would not endorse that characterization and would not welcome a further subdividing of equal protection analysis, candor compels the recognition that the relatively deferential "rational basis" standard of review normally applied takes on a sharper focus when we address a gender-based classification. So much is clear from our recent cases. *Craig v. Boren,* Justice Powell concurring, 429 U.S. at 211, 97 S.Ct. at 464, *see note.*

The Supreme Court has, particularly in cases involving gender-based classifications, used an "elevated standard of scrutiny"[2] when the facts of a case are such as to render the deferential rational relationship test inappropriate.

At this time it does not appear that there exists a verbal formula generally agreed upon that fairly conveys the meaning of this elevated standard of review. In *Craig v. Boren,* the Court required that a law creating a class based on gender be "substantially related" to an "important governmental objective." In *Reed v. Reed,* the Court required a "fair and substantial relation" between the legislation and the objective of the legislation. *Reed citing Royster Guano Co. v. Virginia,* 253 U.S. 412 at 415, 40 S.Ct. 560 at 861, 64 L.Ed. 989 (1920). The applicable standard must be gleaned from each case by looking at the concrete facts giving rise to the decision.

We think the following can be stated with reference to the state of the law in equal protection cases: (1) the two-tiered analysis of equal protection cases is an inadequate framework for analyzing recent work of the Supreme Court; (2) the framework is inadequate because some situations have been given less than strict scrutiny

---

2. The phrase is from *Craig v. Boren, supra,* Mr. Justice Rehnquist dissenting, 429 U.S. at 216–218, at 97 S.Ct. at 467.

but more than minimal scrutiny; and (3) the standard of review for cases that do not fit the old mold is a pliable standard that is not easily captured but tends to be shaped by both the character of the class involved, and the seriousness of the interest allegedly impinged upon.

This pliable standard of review is evident in *Trimble v. Gordon*, —— U.S. ——, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), where Mr. Justice Powell, writing for the majority in an opinion that struck down a classification based upon illegitimacy, stated:

> "[T]his Court requires at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose." . . . In this context, the standard just stated is a minimum; the Court sometimes requires more. "Though the latitude given state economic and social legislation is necessarily broad, when state statutory classification approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny . . ." quoting *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164 at 172, 92 S.Ct. 1400 at 1405, 31 L.Ed.2d 768 (1972).

The case now before the Court is one where the interest at stake "approaches fundamental and personal rights." V. A. educational benefits can make the difference between a higher education that imparts marketable skills and no training for any sort of permanent occupation. In today's specialized society, higher education or training may not be "fundamental" within the narrow legal meaning of that term, but it is certainly essential to employment which will adequately support an individual and his or her family. The scrutiny required when such interests are at stake may not be the strictest but it is much more than the minimum.

In *Craig v. Boren* the class involved (sex) was not suspect, but it came close to being suspect. The interest involved was not fundamental, but rather far from fundamental, *i. e.*, the interest in legally buying 3.2 beer between the ages of 18 and 21. Here we have the converse. The class is not suspect,

but rather far from suspect. The interest is close to fundamental. In this situation it would appear that the standard of review should be comparable to that applied in *Craig v. Boren*.

The government's objective is to reduce fraudulent and wasteful expenditures of money on bogus courses that lead nowhere—a praiseworthy objective. This remedial objective must, of course, be viewed in the context of the larger objective of veterans' programs; namely, to aid veterans in improving their capacities and opportunities by education. It is necessary to determine whether the challenged legislation bears a substantial relation to both the remedial goal and the more primary goal itself.

The challenged legislation could indeed eliminate bogus courses, but in the process, courses, and perhaps institutions, which especially serve veterans will be eliminated also. The challenged statutes are an example of legislative overkill. Fraud and waste are eliminated at the cost of eliminating quality educational opportunities for veterans. A statute that thus overreaches bears something less than a substantial relationship to important governmental objectives; hence, we must hold that the 85–15 rule and two-year rule are unconstitutional.

We are cognizant of the fact that social legislation in the past has not been subjected to as critical a level of scrutiny as that which we have herein applied. *See Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). If the level of judicial scrutiny applied in cases such as *Dandridge v. Williams* is the law for this case, then the decision should be different.

We think the standard has changed since the time cases such as *Dandridge* were decided. Our rationale for concluding that this change has occurred is derived from our analysis of *Reed v. Reed* and its progeny. In cases where the class distinctions are not based upon suspect criteria, but are close to being suspect, an intense review is required. We accept the proposition urged by plaintiffs that there has likewise been an elevation of the standard by which classifi-

cations are judged when interests impinged upon come close to interests categorized as fundamental.

One additional factor that has influenced this Court's decision should be noted; namely, the double-edged manner in which the new 85–15 rule is used. A veteran's enrollment cannot be approved for a course where more than 85 per cent of the students are subsidized in whole or in part by the educational institution, V. A. benefits, or grants from any federal agency. The recipients of all benefits for education from the federal government are thrown together with veterans for purposes of calculating the 85 per cent. But, when time comes for disapproving courses for veterans, then the drawing of class lines suddenly changes; then veterans stand alone to be cut off from benefits. This double-edged manner in which 85–15 is used is obnoxious; it is repugnant to the principle of equal protection.

The 85–15 rule looks innocuous at first glance. The more one ponders 85–15, however, the more troublesome it becomes. What the government gives on the one hand to needy students can arbitrarily cut off veterans who might be equally needy. If aid from federal agencies and educational institutions were to be directed heavily toward one poverty-stricken area to boost the fortunes of young persons hoping to get a higher education, veterans planning on an education could be frozen out indefinitely. The 85–15 rule has a built-in capacity to sting veterans the worst when others are helped the most.

The foregoing contains this Court's findings of fact and conclusions of law and shall constitute the same.