CLELAND, ADMINISTRATOR OF VETERANS'
ADMINISTRATION, ET AL. v. NATIONAL
COLLEGE OF BUSINESS

No. 77–716.   Decided March 20, 1978

PER CURIAM.

The question presented is whether the Due Process Clause of the Fifth Amendment prohibits Congress from restricting the educational courses for which veterans' benefits are available under the GI Bill[1] without including identical course limitations in other federal educational assistance programs.

---

[1] The various provisions dealing with veterans' benefits are contained in Title 38 of the United States Code.   Title 38 U. S. C. § 1651 *et seq.* relate specifically to the veterans' educational assistance program.   While the term GI Bill is often used to describe veterans' benefits legislation generally,

A veteran seeking educational assistance benefits must file an application with the Administrator of the Veterans' Administration. Before approving the application, the Administrator must determine whether the veteran's proposed educational program satisfies various requirements, including the so-called 85–15 requirement and the two-year rule.

The 85–15 requirement requires the Administrator to disapprove an application if the veteran enrolls in a course in which more than 85% of the students "are having all or part of their tuition, fees, or other charges paid to or for them by the educational institution, by the Veterans' Administration . . . and/or by grants from any Federal agency." [2] The Administrator, however, may waive the requirement if he determines that it would be in the interest of both the veteran and the Federal Government.

The two-year rule requires the Administrator to disapprove the enrollment of an eligible veteran in a course that has been offered by a covered educational institution for less than two years. The rule applies to courses offered at branches and extensions of proprietary educational institutions located beyond the normal commuting distance of the institution.[3]

Appellee National College of Business is a proprietary edu-

---

for purposes of this opinion it refers to legislation dealing specifically with veterans' educational assistance benefits.

[2] 38 U. S. C. § 1673 (d) (1976 ed.), as amended by § 205 of Pub. L. 94–502, 90 Stat. 2387. While this appeal was pending, the 85–15 requirement was amended in several respects. See § 305 (a) of the GI Bill Improvement Act of 1977, Pub. L. 95–202, 91 Stat. 1442. However, the amendments have not made the requirement inapplicable to appellee's students.

[3] See 38 U. S. C. § 1789 (1976 ed.), as amended by § 509 (b) of Pub. L. 94–502, 90 Stat. 2401. The rule was recently amended by § 305 (a) of the GI Bill Improvement Act of 1977, supra. The amendment authorizes the Administrator to waive the two-year rule if he determines that it would be in the interest of the veteran and the Federal Government. The Administrator, however, does not suggest that the rule will be waived with respect to appellee's students.

cational institution which has extension programs in several States. Most of its courses have a veteran enrollment of 85% or more. Appellee is therefore affected by both the 85–15 requirement and the two-year rule.

Appellee brought this action in the United States District Court for the District of South Dakota, challenging the constitutionality of the restrictions.[4] Appellee contended that the restrictions arbitrarily denied otherwise eligible veterans of educational benefits and denied veterans equal protection because they were not made applicable to persons whose educations were being subsidized under other federal educational assistance programs.[5] The District Court held the 85–15 requirement and the two-year rule unconstitutional and permanently enjoined their enforcement. 433 F. Supp. 605 (1977). We reverse.[6]

I

The course restrictions challenged by appellee evolved in response to problems experienced in the administration of

---

[4] Other District Courts have upheld the challenged restrictions. See, e. g., Fielder v. Cleland, 433 F. Supp. 115 (ED Mich. 1977); Rolle v. Cleland, 435 F. Supp. 260 (RI 1977).

[5] Joining appellee as plaintiffs in the District Court were four veterans who were students or former students at the National College of Business. The court held they lacked standing because they had not demonstrated how they would be affected by the restrictions. The court, however, held that appellee, which would suffer serious economic harm from application of the restrictions to its students, had standing under the jus tertii doctrine to assert the constitutional claims of its students. Neither of the court's standing rulings is challenged in this Court.

[6] Appellee advanced several other theories of unconstitutionality in the District Court and reasserts two of them in this Court: (1) the restrictions violate substantive due process because they interfere with freedom of educational choice, and (2) they violate procedural due process because the affected veterans are not afforded a hearing on the question whether the requirements should be applied or waived. The District Court characterized these contentions as less meritorious than the equal protection claim. We agree. Neither raises a substantial constitutional question.

earlier versions of the veterans' educational assistance program. When extension of the World War II GI Bill to veterans of the Korean war was under consideration by Congress in 1952, the House Select Committee to Investigate Educational Training and Loan Guarantee Programs under the GI Bill studied the problems that had arisen under the earlier program. The Committee's work led to passage of the first version of the 85–15 requirement, which applied only to nonaccredited courses not leading to a college degree that were offered by proprietary institutions. Pub. L. 82–550, 66 Stat. 667.

The purpose of the requirement is not disputed:

"Congress was concerned about schools which developed courses specifically designed for those veterans with available Federal moneys to purchase such courses. . . . The ready availability of these funds obviously served as a strong incentive to some schools to enroll eligible veterans. The requirement of a minimum enrollment of students not wholly or partially subsidized by the Veterans' Administration was a way of protecting veterans by allowing the free market mechanism to operate.

"The price of the course was also required to respond to the general demands of the open market as well as to those with available Federal moneys to spend. A minimal number of nonveterans were required to find the course worthwhile and valuable or the payment of Federal funds to veterans who enrolled would not be authorized." S. Rep. No. 94–1243, p. 88 (1976) (Senate Report).

These same considerations prompted extension of the requirement in 1974 to courses not leading to a standard college degree offered by *accredited* institutions. § 203 (3) of Pub. L. 93–508, 88 Stat. 1582. See also Senate Report 88.

In 1976 the 85–15 requirement was further extended to courses leading to a standard college degree. The Veterans' Administration had found increased recruiting by institutions

within this category "directed exclusively at veterans." In recommending approval of the extension, the Senate Committee on Veterans' Affairs agreed with the Veterans' Administration that " 'if an institution of higher learning cannot attract sufficient nonveteran and nonsubsidized students to its programs, it presents a great potential for abuse of our GI educational programs.' " *Id.*, at 89. The Committee further noted that, in view of the magnitude of the expenditures under the GI Bill, it was essential "to limit those situations in which substantial abuse could occur." *Ibid.* Finally, the Committee emphasized that "the requirement that no more than 85% of the student body be in receipt of VA benefits is not onerous particularly given the fact that under today's GI Bill . . . veterans do not comprise a major portion of those attending institutions of higher learning . . . ." *Ibid.*[7]

The two-year rule is also a product of Congress' judgment regarding potential abuses of the veterans' educational assistance program based upon experience with administration of earlier versions of the GI Bill. Thus, following World War II schools and courses developed "which were almost exclusively aimed at veterans eligible for GI bill payments." *Id.*, at 128. In response, the first version of the rule was enacted. It barred the payment of benefits to veterans attending institutions in operation less than one year. Pub. L. 81–266, 63 Stat. 653. As with the 85–15 requirement, the rule "was a

---

[7] The 1976 amendments also changed the computation base of the 85–15 requirement, for the first time including students subsidized under other federal assistance programs within the 85% calculation. This change, however, was recently modified by Congress to exclude from the 85% quota students receiving federal assistance from sources other than the Veterans' Administration, until such time as the Administrator has completed a study regarding the need for and feasibility of including them within the 85% computation. § 305 (a) of the GI Bill Improvement Act of 1977. This change has no bearing on this case because appellee has a veterans enrollment of more than 85%.

device intended by Congress to allow the free market mechanism to operate and weed out those institutions [which] could survive only by the heavy influx of Federal payments." Senate Report 128.

Following the Korean war, Congress amended the rule to cover courses that had not been in operation for at least two years. § 227 of the Korean Conflict GI Bill (Veterans' Readjustment Assistance Act of 1952), Pub. L. 82–550, 66 Stat. 667. In its report accompanying the amendment, the House Veterans' Affairs Committee characterized the rule as "a real safeguard to assure sound training for the veteran, at reasonable cost, by seasoned institutions" and observed that had the rule been in effect during the administration of the World War II GI Bill "considerable savings would have resulted and . . . much better training would have been realized in many areas." H. R. Rep. No. 1943, 82d Cong., 2d Sess., 30 (1952).

In 1976, Congress again amended the two-year rule, making it applicable to, among other institutions, branches of private institutions such as appellee that are located beyond the normal commuting distance from the main institution. The considerations underlying the extended coverage are fully set forth in the Report of the Senate Committee on Veterans' Affairs accompanying the legislation. Senate Report, *supra.* There had been a "spectacular" rise in both the number of institutions establishing branch campuses and in the veteran enrollment at those extensions. These institutions were entering into "extensive recruiting contracts directed almost exclusively at veterans." Senate Report 129. In a report dealing with the problems generated by these developments, the Veterans' Administration had stated:

" '[A] number of instances have been brought to our attention which represent abuse of our educational programs. Some of these cases involved contracting between non-

profit schools and profit schools or organizations whereby courses designed by the latter are offered by the non-profit, accredited school on a semester- or quarter-hour basis. In others, there are arrangements between nonprofit, accredited schools and outside profit firms whereby the latter, for a percentage of the tuition payment, perform recruiting services primarily for the establishing of these branch locations for the school. These recruiting efforts are aimed almost exclusively at veterans.' " *Ibid.*[8]

In recommending adoption of the amendment, the Committee concluded that the situation presented "great potential for abuse and in several instances that potential appear[ed] to have been realized." *Id.*, at 130.

## II

As the legislative history demonstrates, the 85–15 requirement and the two-year rule are valid exercises of Congress' power. Experience with administration of the veterans' educational assistance program since World War II revealed a need for legislation that would minimize the risk that veterans' benefits would be wasted on educational programs of little value. It was not irrational for Congress to conclude that restricting benefits to established courses that have attracted a substantial number of students whose educations are not being subsidized would be useful in accomplishing this objective and "prevent charlatans from grabbing the veteran's education money." Both restrictions are based upon the rational assumption that if "the free market mechanism [were allowed] to operate," it would "weed out those institutions [which] could survive only by the heavy influx of Federal payments." *Id.*, at 128.

---

[8] The Administrator amplified on these problems in testimony before Congress. See Senate Report 129–130.

The otherwise reasonable restrictions are not made irrational by virtue of their absence from other federal educational assistance programs. They were imposed in direct response to problems experienced in the administration of this country's GI bills. There is no indication that identical abuses have been encountered in other federal grant programs. In any event, the Constitution does not require Congress to detect and correct abuses in the administration of all related programs before acting to combat those experienced in one. For "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause [generally] goes no further . . . ." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489 (1955). (Citations omitted.)

When tested by their rationality, therefore, the 85–15 requirement and the two-year rule are plainly proper exercises of Congress' authority. While agreeing that the restrictions were rationally related to legitimate legislative objectives, the District Court concluded that veterans' educational benefits approach "fundamental and personal rights" and therefore a more "elevated standard of review" was appropriate. Subjecting the 85–15 and two-year requirements to this heightened scrutiny, the court observed that they were not precisely tailored to prevent federal expenditures on courses of little value. Since some quality courses would be affected by the restrictions, the court held them unconstitutional.

The District Court's error was not its recognition of the importance of veterans' benefits but its failure to give appropriate deference to Congress' judgment as to how best to combat abuses that had arisen in the administration of those

benefits. Legislative precision has never been constitutionally required in cases of this kind.[9]

> "The basic principle that must govern an assessment of any constitutional challenge to a law providing for governmental payments of monetary benefits is well established. Governmental decisions to spend money to improve the general public welfare in one way and not another are 'not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment.' . . . In enacting legislation of this kind a government does not deny equal protection 'merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." ' *Dandridge* v. *Williams,* 397 U. S. 471, 485." *Mathews* v. *De Castro,* 429 U. S. 181, 185 (1976).

Since it was rational for Congress to conclude that established courses with a substantial enrollment of nonsubsidized students were more likely to be quality courses, the 85–15 and

---

[9] Appellee contends that the challenged restrictions will completely deprive some veterans—those who live in areas where there are no programs which satisfy the two requirements—of veterans' educational assistance. While the restrictions on their face simply channel veterans toward courses which Congress has determined are more likely to be worthwhile, they may in fact operate to make benefits functionally unavailable to some veterans not living in close proximity to schools offering qualified programs and unwilling or unable to move to take advantage of the federal assistance. Nevertheless, the fact that Congress' judgment may deprive some veterans of the opportunity to take full advantage of the benefits made available to veterans by Congress is not a sufficient basis for greater judicial oversight of that judgment. As the Court noted in *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 35 (1973), "the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing . . . social and economic legislation."

two-year requirements satisfy "the constitutional test normally applied in cases like this." *Califano* v. *Jobst,* 434 U. S. 47, 54 (1977).

The judgment is reversed.

*It is so ordered.*

MR. JUSTICE MARSHALL.

I believe that substantial constitutional questions are presented by appellee's due process claims, see *ante,* at 215 n. 6, as well as by its equal protection claim. I would therefore note probable jurisdiction and set this case for oral argument.