## PONCE PARAMEDICAL COLLEGE, INC., et al., Plaintiffs,

### v.

## UNITED STATES DEPARTMENT OF EDUCATION, et al., Defendants.

### Civ. No. 94–1773 (HL).

United States District Court, D. Puerto Rico.

July 8, 1994.

---

Luis Plaza, Hato Rey, PR, for plaintiffs.

María H. Ríos, Esq., Asst. U.S. Atty., Hato Rey, PR, for U.S.

James O'Neill, Washington, DC, for Dept. of Educ.

### OPINION AND ORDER

LAFFITTE, District Judge.

"[T]here is no worse torture than the torture of laws."—Francis Bacon

## I. INTRODUCTION

### A. PROCEDURAL HISTORY

This is an action for injunctive relief and declaratory judgment arising out of new regulations promulgated on April 29, 1994 by the Secretary for the Department of Education. 59 Fed.Reg. 22335 (1994) (to be codified at § 600). The regulations define a "proprietary institution of higher education" for purposes of receipt of Title IV, Higher Education Act ("HEA") funds. The new regulations became effective on July 1, 1994. Plaintiffs assert that the new regulations are unjust and illegal.

On June 6, 1994, plaintiffs filed a motion for a temporary restraining order and a pre-

liminary injunction seeking to enjoin defendant from enforcing the regulations. The Court denied the motion for a temporary restraining order, but scheduled a consolidated hearing for the preliminary injunction with a bench trial on the merits under Fed. R.Civ.P. 65(a)(2).

A consolidated hearing was held on June 17 and June 20, 1994. During the hearing, an expert witness for plaintiffs testified and both parties presented oral arguments. At the close of the hearing, the Court ordered the parties to submit post-hearing briefs. Having reviewed the submissions of the parties, the evidence presented and the applicable law, the Court is now ready to rule.

## B. THE PARTIES

Plaintiffs are twenty-four proprietary institutions of higher education providing postsecondary education in the district of Puerto Rico. Prior to July 1, 1994, plaintiffs met the definition of "proprietary institutions of higher éducation" and "vocational schools" within the meaning of sections 481(b) and 435(c) of the HEA. 20 U.S.C. §§ 1088(b) and 1085(c). Therefore, plaintiffs were eligible for participation in student financial aid programs authorized under Title IV of the HEA.

Defendants are the United States Department of Education and the Secretary of the Department of Education. The Department of Education is empowered by law and regulation to supervise and administer the federal assistance educational funds under the Higher Education Act. 20 U.S.C. § 1070.

## C. THE CLAIMS

Plaintiffs claim that they received insufficient notice prior to the publication of the agency's final rules, and that the regulations do not reflect a reasonable interpretation by the agency of Congress' intent in the amended organic statute. For these reasons, plaintiffs claim that the new regulations are arbitrary and capricious, and an abuse of discretion under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Plaintiffs also allege a taking of both liberty and property without proper due process under the Fifth Amendment. Plaintiffs' final three claims allege violations of the Equal Protection Clause of the U.S. Constitution, the Contracts Clause, under Art. I, § 10, cl. 1 of the U.S. Constitution, and the nondelegation doctrine.

## II. BACKGROUND

### A. THE ADMINISTRATIVE RECORD

On March 26, 1992, Representative Maxine Waters proposed on the floor of the House an amendment to the Higher Education Act. Ms. Waters' proposal required proprietary institutions of higher education that receive Title IV, HEA program funds to have at least 15% of their students receive no assistance in their tuition or fees from Title IV, HEA program funds. She stated that the proposed amendment was intended to ensure that for-profit vocational schools would have to compete for Federal student aid dollars by offering quality education that students with private funds would be willing to buy with their monies. Representative Waters stated:

> Mr. Chairman, many proprietary vocational schools have been set up to garner large amounts of Federal student aid dollars. Practically, all of the students receive student loans and grants, and the school offers little or no attraction to people to pay their own funds to attend. In fact, we have instances of proprietary schools refusing to allow people to pay their own money.
>
> After World War II, the Department of Veterans Affairs responded to the rise of schools which were set up to milk the veterans' educational benefits program by establishing a rule which provided that VA would not extend any GI benefits to courses in which more than 85 percent of the students have their fees paid by the VA. A similar rule should apply to the proprietary schools....

Cong.Rec. H1911 (March 26, 1992). The Waters proposed amendment was changed subsequently to track revenues rather than students. *Id.; see* 20 U.S.C. § 1088(b)(6).

On July 23, 1992, Congress passed the HEA amendments, adding a new eligibility criterion to the definition of a "proprietary institution of higher education." 20 U.S.C. § 1088(b)(1)–(6). Under the amendments, in

order to be eligible for participation in the Title IV student financial assistance programs, an institution must have at least "15 percent of its revenues from sources that are not derived from funds provided under the ... [Title IV, HEA programs] ..., as determined in accordance with regulations prescribed by the Secretary." 20 U.S.C. § 1088(b)(6).

The amendments also mandated negotiated rule-making sessions that were held in four different locations following the passage of the amended statute. A draft regulation was circulated in November 1992, prior to the rulemaking sessions. Pursuant to the draft regulation, "an institution satisfies the requirement ... [of a proprietary institution of higher education] .. by examining its revenue under the following formula:

> Title IV, HEA program funds the institution used to satisfy tuition, fees, and other institutional charges to students [divided by]
>
> Income received by the institution from tuition, fees and other institutional charges, plus income received by the institution from activities conducted by the institution that were intrinsic to and necessary for the students' education and training.

Decl. of William Moran, Ex. I. The November 1992 proposed regulation also stated that "[t]he income included in the denominator is from the institution's last complete fiscal year...." *Id.*

The majority opinion at three of the four sessions was that "revenue" should be defined as all income generated by the institution. 59 Fed.Reg. 6464 (1994) (to be codified at 30 C.F.R. pt. 600) (proposed Feb. 10, 1994). On February 10, 1994, the Secretary published the Department's proposed rules. *Id.* The proposed rules introduced a calculation in order to define "revenue" (hereinafter the "85/15 rule"). The rule stated:

> An institution satisfies the requirement ... [of qualifying as a proprietary institution of higher education] by examining its revenues under the following formula:
>
> > Title IV, HEA program funds the institution used to satisfy tuition, fees, and

other institutional charges to students [divided by]

Revenue generated by the institution from tuition, fees, and other institutional charges, plus revenue generated by the institution from other activities conducted by the institution, to the extent not included in tuition, fees, or other institutional charges, that are necessary for its students' education or training.

*Id.* at 6457. Further, the proposed regulations stated that "[t]he revenue included in the denominator is from the institution's last complete fiscal year." *Id.*

With the proposed rules, the Secretary explained the reasons for his selection of the definition of "revenue." The Secretary stated that there were three possible interpretations of "revenue": (1) funds received by the institution from tuition and fees; (2) funds received by the institution from any source and for any purpose; (3) funds received by the institution from tuition and fees plus funds from other activities carried out by the institution that are necessary to the education and training offered by the institution. *Id.* at 6448. The Secretary explained

> that the purpose of the new statutory criterion is to require proprietary institutions to attract students based upon the quality of their programs, not solely because the institutions offer Federal student financial assistance. Thus, under the statute, these institutions must attract students who will pay for their programs with funds other than Title IV, HEA program funds. On the other hand, the Secretary recognizes that many institutions, because of their locations, provide educational opportunities to students in low-income areas who cannot attend postsecondary education without Title IV, HEA program funds. The Secretary considered these two factors, as well as the fact that the criterion relates to whether an institution qualifies as an educational institution, in selecting his proposed interpretation of the term "revenue."

The Secretary believes that counting only the income received from students' tuition and fees is too limiting; on the other hand, the Secretary believes it's in-

appropriate to count as revenues income from businesses that are owned and operated by the institution, regardless of the relationship between the educational institution and the businesses. The Secretary chose the third interpretation because the permitted revenues generated by the institution relate to the purpose of the institution, providing training to students, and are generated as a necessary part of that training.

*Id.* at 6448–49.

Following the publication of the proposed rules, the Secretary accepted comments on the proposed regulations. The voluminous administrative record, which the Court has ferreted, includes comments that raise the issues of the definition of revenue, the accounting method that would be used by the Department in both the numerator and the denominator of the fraction, and the Department's anticipated time-frame for implementing the regulations. *See,* Pls.' Mot. Including Administrative Record.

On April 29, 1994, the Department of Education published the final regulations. 59 Fed.Reg. 22335 (1994) (to be codified at 34 C.F.R. § 600). The Secretary noted that although a number of commenters suggested that the revenue definition in the proposed rule was too narrow, because the Secretary believed it was the proper middle-ground, he did not change the definition. *Id.* at 22327–28. The Secretary also clarified which accounting method would be used in the revenue calculation. It was the agency's practice to have calculated Title IV, HEA program funds, which constitute the numerator in the 85/15 formula, by a cash-based accounting system. Therefore, because the Secretary agreed with the numerous commenters who suggested that there be a consistent method of accounting in the numerator and the denominator, the Secretary amended the proposed rules to require the reporting of revenue in the denominator on a cash basis of accounting as well. *Id.* at 22328. Finally, the rules stated that they would go into effect on July 1, 1994, and the revenue calculation was to be based on the prior fiscal year. 59 Fed.Reg. 22338 (1994) (to be codified at 30 C.F.R. § 600.5(b)(2)(i) and (h)).

## B. FACTS FROM THE SHOW-CAUSE HEARING

During the two-day hearing, the Court heard evidence from plaintiff's expert witness, Mr. Enrique Cardona, a certified public accountant. Mr. Cardona was qualified by the Court to be an expert in the accounting field of the Title IV federal educational assistance funds. Mr. Cardona offered expert testimony as to the possibility of plaintiffs' eligibility under the new regulations as of July 1, 1994. For most of the plaintiffs, Mr. Cardona offered an approximation as to how the schools would fare under the 85/15 rule. *See* Pls.' ex. 12. Although Mr. Cardona's calculations were not done with the precise application of the Department's formula, Mr. Cardona's testimony clearly established that the 85–15 rule will have a devastating effect on almost all of the plaintiffs and on the postsecondary education and training options that will be available to lower-income students on the island.

Cardona testified that fourteen of the twenty-four plaintiff institutions will not be able to comply with the 85/15 rule and therefore, will be unable to continue providing educational services. Pls.' ex. 12. Accordingly, Puerto Rican students who attend or would like to attend said institutions, will have to transfer or apply to institutions that survive the 85/15 rule. According to Cardona, the surviving institutions will be too few in number to accommodate the demand by students, and some students will be without educational possibilities. Tr. 57–68, June 17, 1994.

## III. DISCUSSION

### A. THE ADMINISTRATIVE PROCEDURE ACT

Plaintiffs claim that the Department's regulations violate the APA because they are arbitrary, capricious and an abuse of discretion, because they were finalized without adequate notice, and because they do not constitute a reasonable interpretation of Congress' intent in passing the HEA amendment. We shall discuss each claim in turn.

### 1. Are The Regulations Arbitrary, Capricious, Or An Abuse Of Discretion?

Under the well-rehearsed standard in *Chevron*, there is a two-step inquiry into an agency's interpretation through regulations of a statute. *Heno v. FDIC*, 20 F.3d 1204, 1208 (1st Cir.1994); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). First, the Court must ask if Congress explicitly spoke to the question at issue. *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. If Congress' intent is clear, then that is the end of the inquiry, because both the Court and the Secretary must give full effect to Congress' clear intent. *Id.* If, however, Congress has left an explicit gap for the agency to fill through regulations, the Court must give said regulations controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–444, 104 S.Ct. at 2782.

 Under the APA, the reviewing court "shall hold unlawful and set aside any agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard requires the agency to examine the relevant facts, act consistently with past practice, and present a rational explanation for its regulations. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Puerto Rico Sun Oil Co. v. United States EPA*, 8 F.3d 73, 77 (1st Cir.1993). In determining whether the interpretation is reasonable, the Court's review is limited to the administrative record. *Massachusetts v. Lyng*, 893 F.2d 424, 430 (1st Cir.1990); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 44, 103 S.Ct. at 2867.

 Whether a regulation is arbitrary, capricious or an abuse of discretion is a highly deferential standard of review that precludes the court's substitution of its own judgment for that of the agency. *Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1446 (1st Cir.1992); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). And as long as there is no "clear error of judgment" by the agency, the court shall find the agency's action in accordance with the law. *Town of Norfolk*, 968 F.2d at 1445–46; *Volpe*, 401 U.S. at 416, 91 S.Ct. at 824. The reviewing Court may not create a reasoned basis for an agency's action if the agency has not provided one. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). Nevertheless, the court shall uphold the agency decision if the " 'agency's path may reasonably be discerned.' " *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867 (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)). As explained by the Supreme Court, "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the [agency's] discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." *ABF Freight Sys., Inc. v. NLRB*, —— U.S. ——, ——, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994) (citing *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941)).

In the case at hand, plaintiffs argue that the Secretary's regulations are arbitrary, capricious, and an abuse of discretion because (1) the effective date of July 1, 1994 necessitates the denominator of the 85/15 calculation to be based on funds from fiscal years closed or almost closed, (2) the definition of revenue is too narrow, and (3) the Secretary should have chosen accrual rather than cash-basis accounting for the denominator of the 85/15 calculation.

#### a. The regulations' effective date

Plaintiffs assert two arguments concerning the regulations' effective date: (1) that the statute is retroactive and therefore invalid; and (2) that even if the statute is not retroactive, it is arbitrary, capricious, and an abuse of discretion to base the "revenue" calculation on a fiscal year that has closed.

First, plaintiffs claim that the implementation of the regulation on July 1, 1994 based on the last fiscal year constitutes an invalid retroactive application of an agency regulation. A retroactive statute or regulation is one that " 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.' " *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859, 864 (D.C.Cir.1992) (citing *Neild v. District of Columbia*, 110 F.2d 246, 254 (D.C.Cir.1940)). The Court finds that this is a prospective regulation, one that goes into effect in the future, but is based on an antecedent year. Here, plaintiffs do not have a vested right in their future eligibility as "proprietary institutions of higher education." The statute explicitly provides numerous conditions with which an institution must comply in order to be eligible as "a proprietary institution of higher education" under the HEA. 20 U.S.C. § 1088. The new regulations have changed the requirements for *future* eligibility. The regulations are not undoing the past eligibility of plaintiffs. Therefore, these regulations are not retroactive.

Second, plaintiffs argue that the Secretary's decision to base the prospective statute's formula for revenue on the past fiscal year is arbitrary, capricious, or an abuse of discretion. However, under a faithful application of the *Chevron* analysis, the Court is compelled to find that Congress has explicitly delegated to the Department of Education the authority to determine how to implement the 85/15 rule. Therefore, under *Chevron*'s second inquiry, the Court must determine whether the agency's decision to effectuate the 85/15 rule on July 1, 1994 based on the prior fiscal year is arbitrary, capricious, or an abuse of discretion.

The amended statute, which predicated an institution's eligibility of Title IV, HEA program funds on the institution having at least 15 percent of its revenues from sources other than said funds, became effective on July 23, 1992. Two years later, on April 29, 1994, the Secretary implemented regulations to give effect to the HEA amendments. These regulations became effective on July 1, 1994 and base the "revenue" calculation on the last fiscal year.

Although the Secretary could have avoided possible hardship to institutions and students by delaying the implementation of the regulations, this Court may not substitute its own judgment for a reasonable judgment by the agency. Here, the Secretary's regulations are a reasonable interpretation of the amended statute's desire to withdraw an institution's eligibility if that institution has relied on the federal government Title IV, HEA program funds for more than 85 percent of its revenue. And because there is nothing in the statute that indicates Congress' desire to delay the 85/15 rule in order to provide the institutions with time to comply, the Department's decision to implement the regulations on July 1, 1994 based on the past fiscal year is not a clear error of judgment. Therefore, although the Secretary did not provide an explanation for the timing set out in the final regulation, the Court finds the Secretary's regulations not to be arbitrary, capricious, or an abuse of discretion.

### b. The regulations' definition of "revenue"

Likewise, the Court finds that the Secretary's interpretation of the amended statute's term "revenue" is not arbitrary, capricious, or an abuse of discretion. The amended statute defined a proprietary institution of higher education as having "at least 15 percent of its revenue from sources that are not derived from … [Title IV, HEA program funds] …, as determined in accordance with regulations prescribed by the Secretary." 20 U.S.C. § 1088(b)(6). Under *Chevron*, Congress has explicitly delegated to the Department of Education the authority to make this determination. Therefore, the Court shall undertake *Chevron*'s second inquiry into whether the agency's interpretation of "revenue" was arbitrary, capricious, or an abuse of discretion.

The intent of the statute, as seen from Representative Waters' statements on the floor of the House when she introduced the amendment, was to reduce proprietary institutions' absolute reliance on federal funds. Cong.Rec. H1911 (March 26, 1992). In pro-

posing the new rules and in the promulgation of the final regulations, the Secretary fully explained the reasons for choosing the "middle-ground" definition of revenue: the Secretary believed that limiting revenue to tuition and fees would be too narrow, while expanding the definition beyond income generated for the education and training of the students would be inappropriate. 59 Fed.Reg. 6448–49 (1994) (to be codified at 30 C.F.R. pt. 600) (proposed Feb. 10, 1994); 59 Fed.Reg. 22328–29 (1994) (to be codified at 34 C.F.R. § 600).

The Court finds the Secretary's reasoning to be rationally related to Congress' intent in passing the amended statute. The HEA amendment's intent was to limit Title IV, HEA program eligibility to those schools able to attract students who would pay with private funds. Students, who would be more cautious spending their own funds rather than federal funds, would attend only institutions offering high quality education and training. Institutions would survive the 85–15 rule because they would compete successfully in the free-market of providing educational services. The Secretary's regulations help to implement this intent. The definition of "revenue" includes only income generated by the institutions' activities related to the students' education or training. If the revenue definition had been broader, such as including income from bookstore or cafeteria sales, the definition would not reflect the students' demand for the institutions' educational services. The Secretary's definition of "revenue" includes only that income that reflects the demand by students for the institution's educational offerings; therefore, the rule comports with Congress' intent in passing the HEA amendment. As such, the definition of revenue cannot be said to be arbitrary, capricious, or an abuse of discretion.

### c. The regulations' requirement of cash-basis accounting

■ Plaintiffs' final claim is that the Secretary's requirement of cash-basis accounting is arbitrary, capricious, or an abuse of discretion. As mentioned above, Congress explicitly delegated the determination of the 85/15 revenue calculation to the Department of Ed-

ucation. Obviously, therefore, Congress left an express gap as to which accounting method would be used in calculating the revenue formula. Under *Chevron*, the next question is whether or not the agency's decision to use cash-basis accounting is arbitrary, capricious, or an abuse of discretion. In promulgating the final rules, the Secretary explained why he chose to apply the cash-basis accounting to the denominator of the formula. The agency practice had been to use cash-basis accounting for the Title IV, HEA program funds. Because these funds constituted the numerator, and because numerous commenters requested that the accounting method be consistent for the numerator and the denominator, the Secretary chose cash-basis accounting for the denominator's calculations as well. The Court finds the Secretary's explanation to be reasonable and as such not arbitrary, capricious, or an abuse of discretion.

### 2. The APA's Requirement Of Notice And Comment

Plaintiffs also allege that the Secretary did not comply with the notice and comment provisions of the APA. The Court finds this argument to be unpersuasive. Under 5 U.S.C. § 553, the agency must publish a general notice of proposed rulemaking in the Federal Register and provide interested parties an opportunity to comment. 5 U.S.C. § 553(b) and (c). The Court finds that the Secretary of the Department of Education has met both of these requirements.

■ Notice is adequate if it clearly apprises interested parties of the issues at stake in the proposed rule to the extent that the parties may participate in the rulemaking in a meaningful way. *American Medical Ass'n v. Unites States*, 887 F.2d 760, 767, 768–89 (7th Cir.1989). Here, the agency published its proposed rule in the Federal Register on February 10, 1994. 59 Fed.Reg. 6446 (1994) (to be codified at 30 C.F.R. pt. 600). Thereafter, the Secretary accepted comments until March 14, 1994. The administrative record contains comment letters that cover the three issues of the definition of revenue, the accounting method to be used, and the implementation date of the regulations. *See* exs.

attached to Defs.' Mot. for Summ. J. Therefore, plaintiffs were on notice as to these issues and could and did participate in the rulemaking process in an informed manner.

 An agency may change its rules after the notice is published provided that the final rule is a "logical outgrowth" of the proposed rule. *Public Service Comm'n v. F.C.C.,* 906 F.2d 713, 717 (D.C.Cir.1990); *American Medical Ass'n,* 887 F.2d at 767–769. A final rule may differ from the proposed rule when the comments demonstrate the need for a change. *Edison Electric Inst. v. OSHA,* 849 F.2d 611, 621 (D.C.Cir.1988). Here, the Department of Education did provide a change in the final regulation when it decided that cash-basis accounting would be used in the denominator of the 85/15 calculation. This change was a logical one, however, and affected only an issue that the parties knew was on the bargaining table. As the Secretary explained in the publication of the final rule, the cash-basis accounting method was selected upon the advice of commenters who recommended consistency with the method used for the numerator. Therefore, the agency's decision to change the regulation did not violate the APA.

### 3. The Regulations' Implementation Date

 Plaintiffs also argue that the Secretary should delay the July 1, 1994 effective date of the regulations in order to provide plaintiffs with enough time to comply. The only requirement under the APA, however, is that the final rule go into effect no less than thirty days after the final regulations' publication. 5 U.S.C. § 553(d). Here, the final rule was published on April 29, 1994 and it went into effect sixty-two days later on July 1, 1994. Therefore, the Secretary has complied with said APA requirement.

Plaintiffs argue that the Secretary has to delay the regulations' effective date in order to allow the industry to adjust. *National Ass'n of Indep. Tel. Producers & Distribs. v. F.C.C.,* 502 F.2d 249 (2nd Cir.1974) (hereinafter "*NAITPD*"). In *NAITPD,* the FCC published an amendment to an existing regulation and provided only eight months notice prior to its effective date. The original regulation provided prime time television availability for independently created programs. *NAITPD,* 502 F.2d at 251. The amendment reduced the number of half-hours available for independently produced programs. The Court held that eight months notice prior to the implementation of the amendment was not reasonable and therefore, enjoined the implementation until one year after the intended effective date. The Court reasoned that the independents had produced programs in reliance on the original regulation and such short notice of the amendment which reduced prime time availability for independents did not provide them with enough time to withdraw from these production ventures and would cause them unnecessary expense. *Id.* at 254.

*NAITPD* is a very distinct situation from the one at hand. In *NAITPD,* the Court enjoined the implementation of the amended regulation because the independent producers were told to do one thing with the original regulations, and then were told to do another with the amended regulations. The producers, thus needed additional time in order to adjust. Here, plaintiffs have been told basically the same thing since the 1992 HEA amendment directed the Secretary to implement an 85/15 rule. Since said amendment, the institutions have known that the Secretary would promulgate regulations restricting eligibility for Title IV, HEA funds to only those institutions that receive at least 15 percent of their revenues from non-Title IV, HEA program funds. Moreover, and contrary to plaintiffs' allegations, since November 1992 with the circulation of the discussion draft, plaintiffs have known that the Secretary intended to base the revenue calculation on the last fiscal year.

Another difference between *NAITPD* and the case before us is that in *NAITPD,* the FCC promulgated amended regulations that contravened the original regulations. Here, however, the Secretary published final rules which corresponded with Congress' intent. The institutions have never been subject to a contrary law or regulation, as in *NAITPD.* Therefore, the regulations at issue are not "unreasonable" and do not necessitate a delay in implementation for adjustment. The

Secretary has waited two years since the passage of the HEA amendments in order to implement these regulations. Although the implementation of this rule may cause plaintiffs hardship, and therefore a delay of the rules' implementation date would be preferable, there is nothing in the law that requires the Secretary to extend this period.

### B. TAKING OF LIBERTY OR PROPERTY UNDER THE FIFTH AMENDMENT

Plaintiffs claim that the regulations constitute a "taking" of their liberty and property interests. The Court finds otherwise. An expectation of a future eligibility of Title IV, HEA program funds is not a "vested right." *Association of Accredited Cosmetology Schools,* 979 F.2d at 864. The amended statute defines the extent to which a property right or a liberty right exists. *See,* 20 U.S.C. § 1088. Specifically, the institutions must have no more than 85 percent of their revenue from Title IV, HEA program funds in order to participate in the Title IV programs. Institutions that cannot meet the 85/15 requirement have no property right or liberty right in said programs as of July 1, 1994.

Moreover, when Congress enacts general legislation eliminating a statutory right, or affecting the "benefits and burdens of economic life" the legislative process provides all the required due process under the Fifth Amendment. *Hoffman v. City of Warwick,* 909 F.2d 608, 619–20 (1st Cir.1990) (citing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982)); U.S. Const., 5th Am. Similarly, an agency's determination in adopting a regulation affecting a general class of persons constitutes all the procedural due process required. *United States v. LULAC,* 793 F.2d 636, 648 (5th Cir.1986). The HEA amendment was duly enacted by Congress and the final regulation was adopted by the Secretary of the Department of Education. Both the amended statute and the regulations affect a general class of persons. Therefore, although the Court does not find a

taking of property, even if there had been a taking, the Court finds that there was due process of law afforded to plaintiffs and hence there was no Fifth Amendment violation.

### C. EQUAL PROTECTION CLAUSE

Plaintiffs claim that the amended statute, 20 U.S.C. § 1088, and the final regulations, 30 C.F.R. 600.5, violate the Equal Protection Clause of the Fourteenth Amendment, made applicable to the federal government through the Fifth Amendment's Due Process Clause. *See, Campos v. INS,* 961 F.2d 309, 316 (1st Cir.1992). Plaintiffs provide no proof of a racially discriminatory intent on the part of Congress in its passage of this statute and therefore, have not demonstrated any violation of the Equal Protection Clause. *Village of Arlington Heights v. Metropolitan Hous. Dev't Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Moreover, there is no cause of action under the Equal Protection Clause against legislation that results in a racially disproportionate impact, without proof of discriminatory intent. *Id.* at 264–64, 97 S.Ct. at 563.

Plaintiffs also argue that the legislation unconstitutionally discriminates against institutions that provide education to poor Puerto Rican students. This argument also fails. Congressional legislation providing classifications for receipt of governmental payments of monetary benefits does not violate the Equal Protection Clause if the classification has a "reasonable basis." *Cleland v. Nat'l College of Business,* 435 U.S. 213, 222, 98 S.Ct. 1024, 1029, 55 L.Ed.2d 225 (1978). It is true that this legislation and implementing regulation may prove a hardship on schools providing education and training for lower-income students whose educational opportunities may be restricted as said institutions lose their Title IV eligibility. The Court, however, finds that Congress had a legitimate interest in passing the statute: namely, to provide better education for these same students by tightening the eligibility requirements for Title IV, HEA program funds. *See, Id.* at 219, 98 S.Ct. at 1028.[1] The

---

1. The statute at issue in *Cleland* involved an 85/15 rule to determine the eligibility of edu-

statute and implementing regulations are rationally related to said legitimate congressional interest. Therefore, the Court finds that this legislation does not offend the Constitution.

## D. CONTRACTS CLAUSE

■ Plaintiffs also argue that the amendments to the HEA violate the Contracts Clause of the U.S. Constitution. U.S. Const., Art. I, § 10, cl. 1. The Contracts Clause, however, prohibits *States* from passing a law that impairs contractual obligations. *Jackson Sawmill v. United States*, 428 F.Supp. 555 (E.D.Mo.1977), *aff'd*, 580 F.2d 302 (8th Cir.1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979). This clause does not apply to laws passed by Congress. *Hepburn v. Griswold*, 75 U.S. 603, 8 Wall 603, 19 L.Ed. 513 (1869); *United States v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984 (D.S.C.), *aff'd in part, vacated in part on other grounds*, 858 F.2d 160 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Accordingly, contrary to plaintiffs' assertion, the Court finds that the HEA amendments, which were passed by Congress, do not violate the Contract Clause.

## E. NONDELEGATION DOCTRINE

■ Finally, plaintiffs argue that Congress improperly delegated its legislative powers to the Department of Education.[2] Because of the constitutional provision requiring the separation of powers, Congress generally cannot delegate its legislative power to another branch of the government. *Field v. Clark*, 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892); U.S. Const., Art. I, § 1. However, it is understood that Congress cannot perform its job without the ability to delegate to agencies under general

directives. *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989). Therefore, if Congress lays down an "intelligible principle" by which an agency must conform, the delegation is not a forbidden delegation of authority. *Id.* Moreover, when Congress is silent or ambiguous concerning a specific issue, it constitutes an express delegation of authority to the agency to fill the gap. *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782.

■ Plaintiffs argue that the HEA amendments do not clearly delineate the policy and boundaries of the delegated authority. The Court finds otherwise. The statute provides that the requirement of "at least 15 percent of its revenues from sources that are not [Title IV, HEA program funds]" is to be "determined in accordance with regulations prescribed by the Secretary." 20 U.S.C. § 1088(b). This constitutes an express delegation of authority to the Department of Education to specifically formulate the 85/15 rule. In other words, Congress created the policy of limited eligibility of institutions through an 85/15 rule and delegated to the Department the authority to determine the specifics of the rule. The Court finds that Congress laid out an "intelligible principle" by which the agency could, and did, comport. Accordingly, there is no constitutional issue here concerning the nondelegation doctrine.

WHEREFORE, based on the foregoing, the Court hereby denies plaintiffs' request for both a preliminary injunction and a permanent injunction.

### CAVEAT

The Court is sensitive to the devastating effects arising from the amended statute and new regulations. The Court is keenly aware that because of the nature of the 85/15 rule, those institutions that will be the hardest hit

---

cational courses for which veterans' benefits would be available. The statute was enacted in order to create a free market where Federal funds to veterans would only purchase valuable and worthwhile educational courses. The Court found that the statute was rationally related to this legitimate interest.

Ms. Waters modeled her HEA floor amendment upon the veterans' 85/15 rule. Cong. rec. of March 26, 1992, at H1911. Therefore, the

Supreme Court's ruling that an 85/15 rule that applies to educational courses for Federal veterans' funds is instructive when facing the issue before the Court today.

**2.** The issue of improper delegation was not in plaintiffs' complaint or their amended complaint. However, because plaintiffs raised the issue during their oral argument at the hearing, the Court requested the parties to brief the issue.

may be those with predominantly hispanic and black students. Nevertheless, the Court may only afford remedies when there has been a violation of the law. Here, neither the statute nor the regulations create such a violation. And judges, if they are to be faithful to the sanctity of their oath, must follow the law and avoid succumbing to their personal preferences.[3]

The problems and hardships that may occur due to the 85/15 rule demand a political and not a legal solution. The Court notes that Congress has been working on enacting legislation that would delay the implementation of the regulations. On June 9, 1994, the Hispanic Caucus sent to the Secretary of the Department of Education a letter signed by every member of the caucus requesting the postponement of this rule. Pls.' ID 17. Twenty members of the Education and Labor Committee sent a letter on June 10, 1994 to Chairman Smith of the Labor, Health and Human Services and Education Appropriations Subcommittee requesting his assistance in delaying implementation of the 85-15 rule. Pls.' ID 18. Upon the support evidenced by these letters, a bill that would delay the implementation of the 85/15 rule passed the House on June 29, 1994, H.R. 4606, and is awaiting a vote in the Senate. Plaintiffs' redress lies not with this Court, but with Congress.

Because the Court must decide this case on the administrative record and the applicable law, the Court is compelled to deny plaintiffs' request for injunctive relief. Moreover, having consolidated the show cause hearing with a hearing on the merits, the Court hereby dismisses the complaint.[4] Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

---

3. "For the highest exercise of judicial duty is to subordinate one's personal pulls and one's private views to the law of which we are all guardians—those impersonal convictions that make a society a civilized community, and not the victims of personal rule."—Justice Felix Frankfurter.

4. The Court need not rule on defendants' motion for summary judgment because the Court has ruled on the merits.